IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CAMERON WILLIAMS, | ) | Case No. 4:22CV3071 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SCOTT FRAKES, BRAD HANSEN, | ) | |
| SCOTT BUSSBOOM, CHRISTOPHER | ) | |
| CONNELLY, MATILDA SERNA, | ) | |
| ATHENA SHERMAN, SUSAN TALENT, | ) | |
| NICHOLAS NEUJARH, JUSTIN | ) | |
| HOUSEMAN, MICHELLE CAPPS, | ) | |
| SHAWN SHERMAN, TODD HAUSSLER, | ) | |
| CHELSEA DE LA CRUZ, | ) | |
| DIANE SABATKA RINE, BARB | ) | |
| LEWIEN, CRAIG GABLE, | ) | |
| TAGGART BOYD, and | ) | |
| JOHN DOE Nos. 1-5, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

INTRODUCTION

This is a Civil Rights action filed by Plaintiff Cameron Williams, a State Prisoner, for damages and declaratory and injunctive relief for violations of his Constitutional rights to be free from cruel and unusual punishment, to due process, and to equal protection of the laws.

JURISDICTION

1.      This action arises under the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

2.      This Court has jurisdiction over Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court also has authority under 42 U.S.C. § 1988 to award Plaintiff his reasonable attorneys' fees, litigation expenses, and costs.

1

## VENUE

3.     Venue is proper in this United States Federal District pursuant to the provisions of 28 U.S.C. § 1391(b) because: a) on information and belief, each Defendant resides in this district; and, b) a substantial part of the events or omissions giving rise to the claim occurred in this district.

## EXHAUSTION

4.     Plaintiff has exhausted all available administrative remedies in the matters ascribed in the within Complaint.

## PARTIES

5.     Plaintiff, Cameron Williams, is incarcerated at the Reception and Treatment Center (RTC), formerly the Lincoln Correctional Center (LCC), under the supervision of NDCS. But during the events described in this complaint Plaintiff was incarcerated at Tecumseh State Correctional Institute (TSCI) and the Nebraska State Penitentiary (NSP).

6.     Scott Frakes, Director of NDCS is sued in his individual and official capacities.

7.     Brad Hansen, who was at relevant times the Warden at TSCI, is sued in his individual capacity.

8.     Scott Bussboom, who was at relevant times the Deputy Warden of TSCI, is sued in his individual capacity.

9.     Christopher Connelly, who was at relevant times an NDCS Captain, is sued in his individual capacity.

10.     Matilda G. Serna, who was at relevant times an NDCS Captain, is sued in her individual capacity.

11.     Athena Sherman, who was at some relevant times an NDCS Housing Unit Manager and at other relevant times an NDCS Housing Unit Administrator, is sued in her individual capacity.

12.     Susan Talent, who was at relevant times an NDCS Housing Unit Manager, is sued in her individual capacity.

13.     Nicholas Neujahr, who was at relevant times an NDCS Correctional Officer, is sued in his individual capacity.

14.     Justin Houseman, who was at relevant times an NDCS Unit Manager, is sued in his individual capacity.

15.     Michelle Capps, who was at relevant times an NDCS Warden, is sued in her individual capacity.

16.     Todd Haussler, who was at relevant times an NDCS Unit Manager, is sued in his individual capacity.

17.     Shawn Sherman, who was at some relevant times an NDCS Unit Administrator, and at some relevant times a gang intelligence captain, is sued in his individual capacity.

18.     Diane Sabatka-Rine, Chief of Operations for NDCS, is sued in her individual capacity.

19.     Chelsea De La Cruz, who was at relevant times an NDCS Case Manager, is sued in her individual capacity.

20.     Craig Gable is the current Warden of TSCI and is sued in his official capacity.

20a.    Barb Lewien is the current Warden of Omaha Correctional Center (OCC) and is sued in her official capacity.

21. Taggart Boyd is the current Warden of the Reception and Treatment Center and is sued in his official capacity.

22. Plaintiff has designated defendants whose identity has not yet been determined as John Doe Nos. 1-5 and sues these Defendants in their individual and official capacities. Plaintiff will amend this complaint to allege the true first names or full names, as applicable, when ascertained.

## FACTS

23. At all times relevant to this action the State of Nebraska (State), and its agency, NDCS, operated several prison facilities which included, LCC, NSP and TSCI. During relevant times Frakes has been the director of NDCS and the Nebraska Attorney General's office has communicated with members of the public on behalf of NDCS and/or Frakes.

24. At all times relevant to this complaint it has been the sworn duty of NDCS to protect prisoners in their custody; and the Eighth Amendment has required prison officials to take reasonable measures to guarantee inmate safety by protecting them from attacks by other prisoners[1].

25. At all relevant times, Plaintiff was a resident of Johnson County, Nebraska or Lancaster County, Nebraska. He was a prisoner having been sentenced to prison. At some relevant times, Plaintiff was housed at TSCI in Johnson County, and at other times relevant to this complaint, he was housed at NSP in Lancaster County, Nebraska.

## THE THREAT

26. On or about March 3, 2011, Jonathan Armendariz, (Armendariz), murdered Plaintiff's brother, Kyle Williams. In September 2011, Armendariz began serving his sentence in

---

[1] *Patterson v. Kelley,* 902 F.3d 845, 851 (8th Cir. 2018).

NDCS custody for the murder of Plaintiff's brother. At all relevant times, Armendariz and other inmates acting on his behalf posed a substantial risk of harm to Plaintiff were he to be placed at the same facility as Armendariz or as any of those inmates acting on his behalf. At all relevant times, all Defendants were aware of that substantial risk.

27.     About the time when Armendariz was placed in NDCS custody, Plaintiff's mother was advised by the State and the Attorney General that: a) the State, NDCS, and/or the Attorney General would always advise Plaintiff's mother when Armendariz was transferred; and b) Armendariz would never be placed at the same NDCS facility as Plaintiff, to ensure Plaintiff's safety.

28.     From 2011 and thereafter, all Defendants were aware that Armendariz, and other prisoners associated with him or acting on his behalf, posed a substantial and foreseeable risk of harm to Plaintiff's safety.

29.     From 2011 and thereafter, all Defendants were aware that Armendariz was on Plaintiff's "Central Monitoring" or "Keep Separate" list.  They were also aware that Plaintiff and Armendariz should always be housed at separate facilities, and that failure to do so increased the substantial risk that Armendariz would harm Plaintiff.

30.     At all relevant times, all NDCS facilities, including TSCI and NSP were overcrowded and understaffed.   The overcrowding and understaffing of those facilities, which all Defendants were aware of, created or presented another substantial risk of harm to Plaintiff. Since TSCI and NSP were both overcrowded and understaffed, placing Plaintiff at the same facility as Armendariz or any of his associates or inmates acting on his behalf posed an even greater substantial risk of harm to Plaintiff.

31.    Defendants ignored and disregarded these known risks. Plaintiff was housed at TSCI from 2013 until 2018, under a known risk.

32.    During the summer of 2017 or before, Defendants transferred Armendariz to TSCI from NSP, despite a long-standing NDCS central monitoring determination to separate Armendariz from Plaintiff *by facility*, (as opposed to by housing unit or by programming).

33.    On information and belief, at the time when Armendariz was transferred to TSCI from NSP, as Unit Manager and later as Unit Administrator at TSCI, Athena Sherman was responsible for reviewing classification paperwork completed by housing unit staff at TSCI. She was also in charge of or involved in transferring inmates at TSCI. This included transferring inmates to TSCI and transferring inmates from TSCI.

34.    During the time period before Armendariz' transfer to TSCI through 2018, Connelly's and Serna's job duties included investigating gang and security threat group activity at NDCS and gathering intelligence related to such activity. Connelly, Serna, and other NDCS staff regularly investigated gang and security threat group activity during that time period and were aware of gang or security threat group associations between or among NDCS prisoners. On information and belief, this included such associations between Armendariz and other NDCS prisoners.

35.    Frakes, Hansen, Athena Sherman, Sabatka-Rine and Capps authorized and facilitated Armendariz' transfer to TSCI, notwithstanding the overcrowding and understaffing of TSCI, despite the substantial risk of harm  which Armendariz and his associates posed to Plaintiff, and contrary to the prior assurances by NDCS staff to Plaintiff and to Plaintiff's mother that Armendariz would always be kept at different facility from Plaintiff. Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Talent, Neujahr, Houseman, Capps, Haussler,

Sean Sherman, and De La Cruz all knew about Armendariz' transfer as soon as it had occurred, or immediately thereafter. They were all aware of the central monitoring designation that Plaintiff and Armendariz should be separated by institution.

36.     None of these Defendants informed Plaintiff that Armendariz was at the same facility as Plaintiff.  In fact, Plaintiff did not learn of Armendariz' transfer to TSCI until October 2017.

37.     When Plaintiff learned that he was being housed at the same facility as Armendariz, Plaintiff immediately warned Defendants again that Armendariz posed a substantial risk of harm to him, and he requested protection.

38.     From the time when Plaintiff learned that Armendariz was at TSCI, and thereafter, Plaintiff was afraid for his life because he knew that Armendariz and inmates associated with him posed a substantial threat of harm to him, and Plaintiff suffered continuous mental and emotional harm as a result.

39.     Plaintiff's mother was never advised or informed by any Defendant or by any other person, that Armendariz had been placed at the same facility as Plaintiff.

40.     Shortly after Plaintiff learned of Armendariz' transfer to the same facility, he informed his mother of it.  Plaintiff also informed his mother that NDCS was violating its own institutional policies regarding separating inmates with known conflicts, including its "Keep Separate" or "Central Monitoring" policies.

DEFENDANTS' DELIBERATE INDIFFERENCE TO KNOWN<br/>SUBSTANTIAL RISK OF HARM

41.     Plaintiff's mother then called TSCI and spoke with Hansen about the situation. Plaintiff's mother requested that NDCS separate Armendariz from Plaintiff by facility

7

immediately.  She also asked why NDCS did not notify her that Armendariz had been placed at the same facility as Plaintiff.

42.    Hansen informed Plaintiff's mother that she had nothing to worry about because Armendariz was being housed in the Special Management Unit (SMU), for disciplinary reasons, and Plaintiff was being housed in General Population (GP), so Plaintiff would not have contact with Armendariz. On information and belief, at that time, inmates in GP at TSCI had contact with inmates in the SMU, particularly due to the ongoing overcrowding and understaffing. Frakes, Hansen, Athena Sherman, De La Cruz, and all other Defendants knew this at that time.

43.    Plaintiff's mother then informed Plaintiff about what Hansen had told her, which was essentially that Hansen, Frakes, and other NDCS staff had no intention of transferring Plaintiff or Armendariz to another facility.

44.    Plaintiff then wrote to Frakes to remind and warn him of the institutional "Keep-Separate" "Central Monitoring" restriction, which was meant to protect Plaintiff from Armendariz, and which was being violated by Defendants.

45.    Frakes did not make any efforts to separate Plaintiff from Armendariz in response to Plaintiff's plea for help. Frakes just told Plaintiff to work with his Unit Staff.

46.    Plaintiff then went to his Unit Housing Manager, Talent, and informed her of the central monitoring violation, and requested an immediate transfer in order to separate him from Armendariz. Talent told Plaintiff that it was not time for his "Yearly-Classification Review" and that it did not matter that Plaintiff and Armendariz were both housed at TSCI at the same time because Armendariz was in SMU. Talent took no action to separate Plaintiff from Armendariz, even though she knew of the substantial risk of harm which Armendariz posed to Plaintiff.

47.     However, Talent informed Plaintiff that she would talk to Bussboom about Plaintiff's concerns regarding Armendariz.

48.     Plaintiff followed up with Talent by asking her what she had heard from Bussboom. Talent did not respond to Plaintiff and ignored Plaintiff's repeated requests for help.

49.     Plaintiff then contacted Bussboom and directly warned him about the threats to his life due to Armendariz being at TSCI, including that Armendariz could be released out of SMU into GP where Plaintiff was located and harm Plaintiff. Bussboom replied that he and NDCS would handle the situation when the time came, and that Armendariz would never be released in the same facility location as Plaintiff.

50.     Plaintiff had worked with his Unit Staff, as Frakes had directed him to do, but it was to no avail.

51.     Over the next six months Defendants did not make efforts to separate or protect Plaintiff from Armendariz.

52.     During his reclassification in March, 2018, Plaintiff again asked to be transferred to a different facility, because Defendants had refused do so up to that time. Before the reclassification, Bussboom had told Plaintiff that he would support him being transferred to NSP if his unit staff would make a reclassification recommendation for transfer. Accordingly, at that time, Plaintiff asked his unit case manager, Houseman, to recommend a transfer to NSP, in order to separate him from Armendariz. Plaintiff asked Houseman to recommend the transfer to NSP, specifically, because Bussboom had told Plaintiff that he would support that request.

53.     Plaintiff specifically told Houseman that Armendariz had killed his brother, that Armendariz posed a substantial risk of harm to him, and that he should be transferred for his own safety. Houseman knew of this risk because it was in Plaintiff's institutional file and NDCS

central monitoring records, and as case manager, he had access to those records, and it was his responsibility to review and consider them. Houseman then told Plaintiff that he believed Plaintiff should be transferred and that he would speak to Neujahr about getting his transfer approved.

54.    Plaintiff then explained to Neujahr that he needed to be transferred to a different facility for protection from Armendariz, and he told Neujahr that he wished to be transferred to NSP, again, because Plaintiff understood that Bussboom would support transfer to NSP. Neujahr then told Plaintiff that he would be recommending that Plaintiff be transferred to NSP, but not until his yearly classification came up. Houseman then called Plaintiff to his office to sign some paperwork.

55.    At that time, Plaintiff saw that Neujahr and/or Houseman were recommending his transfer to NSP, medium custody. Houseman then told Plaintiff that it would take a few weeks to hear back from NDCS' Central Office about his classification/transfer recommendation.

56.    After several weeks, Plaintiff received his classification action response from NDCS notifying him that he had been approved to be transferred to NSP, medium custody level.

57.    On or about May 10, 2018, after she had already spoken with Bussboom, Plaintiff's mother, Anita Parsons ("Parsons") sent a letter to Frakes, warning Defendants – yet again – of the danger of housing Armendariz at the same facility as Plaintiff, and asking Defendants to expedite Plaintiff's transfer to NSP, which had already been approved by NDCS staff. But Plaintiff was still not transferred out of TSCI.

58.    Plaintiff had told Neujahr, Talent, Houseman, Bussboom, Hansen, and Frakes in letters, other writings, and conversations, that it was imperative to his safety, for Plaintiff to be immediately transferred out of TSCI to NSP, but Defendants did not transfer him.

DEFENDANTS PLACED PLAINTIFF IN DIRECT CONTACT
WITH HIS BROTHER'S MURDERER, AND PLAINTIFF
PROTECTED HIMSELF, BECAUSE DEFENDANTS WOULDN'T

59.     *Against all these repeated requests for protection, Defendants released Armendariz from SMU and moved him to the exact same housing unit as Plaintiff.* At a minimum, Frakes, Hansen, Bussboom, Athena Sherman, Neujahr, Talent, De La Cruz, Houseman, and Haussler facilitated or allowed Armendariz to be moved from SMU to Plaintiff's housing unit. Armendariz' placement in Plaintiff's housing unit set in motion the following violent event.

60.     Once Armendariz was in the same housing unit as Plaintiff and moving about freely, Plaintiff knew that it would be just a matter of time before he would be attacked by Armendariz, where the likely outcome would be Plaintiff's death.  Since all Defendants had, to that point in time, failed to separate Plaintiff from Armendariz or otherwise protect Plaintiff, and had ignored his repeated warnings and requests for protection, Plaintiff protected himself by preemptively assaulting Armendariz, because Plaintiff knew that would ensure that he was transferred to a different housing unit and separated from Armendariz immediately. Plaintiff was then taken to SMU where TSCI / NDCS staff would have no choice but to transfer Plaintiff.

61.     Plaintiff remained on SMU in isolation for about a week.

62.     Defendants then transferred Plaintiff to NSP.

63.     *But due to the previous conflict, which included Defendants' knowingly subjecting Plaintiff to direct and close contact with Armendariz, which Defendants had set-up, Armendariz' security threat group was now looking for Plaintiff and seeking to retaliate against him at NSP.* On information and belief, Defendants were aware of this because of security threat group or

11

other intelligence that had been collected by Connelly, Serna, and other NDCS investigative efforts.

64.     When Plaintiff was transferred to NSP, Frakes, Capps, Connelly, Serna, and other NSP staff knew from this intelligence that inmates at NSP who were associated with Armendariz and/or who were members of Armendariz' security threat group presented a substantial risk of harm to Plaintiff, because they sought to retaliate against Plaintiff for the TSCI altercation between Armendariz and Plaintiff. And these Defendants knew that Plaintiff needed to be separated from these NSP inmates.

65.     Frakes, Capps, Connelly, Serna did not separate Plaintiff from these NSP inmates associated with Armendariz and/or members of Armendariz' security threat group and did not make any other efforts to protect Plaintiff from them.

66.     On September 22, 2018, Frakes, Capps, and John Doe Nos. 1 through 5 allowed several prisoners, who were associates of Armendariz or members of his security threat group, and who were acting on behalf of Armendariz in retaliation for the TSCI altercation, to access Plaintiff's cell, and these prisoners brutally assaulted and stabbed Plaintiff multiple times.

67.     Plaintiff's injuries from this assault included a left flank stab wound, a left upper quadrant stab wound, a left lateral maxillary sinus fracture, and a left side buccal space hematoma.  Surgery was required for the evacuation of the hematoma. Plaintiff has experienced pain every day from these injuries since this attack. Plaintiff has also suffered psychological trauma, including post-traumatic stress disorder (PTSD), because of the attack. Plaintiff's injuries are serious and are medically diagnosable.

68.     Defendants Frakes, Capps, John Doe Nos. 1 through 5, have not provided Plaintiff proper medical care for his injuries since they were sustained, although Plaintiff has requested it.

There was a delay in administering any care after the assault occurred. The care administered was inadequate. Proper follow up care has not been provided to Plaintiff.

CLAIMS FOR RELIEF

Claim I – 42 U.S.C. § 1983 – Failure to Protect

69.     Plaintiff re-pleads the allegations of paragraphs 1 through 68 above and incorporates them herein, as if fully set forth.

70.     Defendants Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Neujarh, Houseman, Talent, Capps, Sean Sherman, Haussler, De La Cruz, and Sabatka-Rine subjected Plaintiff to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

71.     Defendants Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Neujarh, Houseman, Talent, Capps, Sean Sherman, Haussler, De La Cruz, and Sabatka-Rine knew or should have known that Armendariz, his associates, and his security threat group posed a substantial risk of harm to Plaintiff, especially if any of those inmates were housed in the same housing unit or facility as Plaintiff.

72.     Defendants Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Neujarh, Houseman, Talent, Capps, Sean Sherman, Haussler, De La Cruz, and Sabatka-Rine were deliberately indifferent to the known substantial risk of harm which Armendariz, his associates, and his security threat group posed to Plaintiff. Despite the repeated warnings by Plaintiff and by his mother of this risk, and contrary to NDCS central monitoring policy and records, each of these Defendants caused or allowed Plaintiff to be placed at the same facility as Armendariz, his associates, and/or his security threat group. Each of these Defendants also caused or allowed Armendariz, his associates, and/or his security threat group to be housed in the

same housing unit as Plaintiff. Further, each of these Defendants also caused or allowed Armendariz, his associates, and/or his security threat group to come into direct contact with Plaintiff.

73.     Defendants Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Neujarh, Houseman, Talent, Capps, Sean Sherman, Haussler, De La Cruz, and Sabatka-Rine knew or should have known that NSP and TSCI were understaffed and overcrowded, which increased an already substantial risk of harm to Plaintiff and other similarly situated prisoners.

74.     All Defendants ignored Plaintiff's repeated warnings regarding his fears of Armendariz, his associates, and his security threat group, and his requests for separation or protection from them.

75.     Frakes, Hansen, Sabatka-Rine, and Capps did not have an effective policy for separating one prisoner from other prisoners known to be a safety threat.  All Defendants failed to implement any policy for separating prisoners where there was a known safety threat.

76.     Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Neujarh, Houseman, Talent, Capps, Sherman, Haussler, De La Cruz, and Sabatka-Rine ignored and/or acted contrary to NDCS policies regarding separating inmates with conflicts.

77.     Despite being aware of the risks mentioned above, Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Neujarh, Houseman, Talent, Capps, Sherman, Haussler, De La Cruz, and Sabatka-Rine were deliberately indifferent to those risks and did not protect Plaintiff from those risks.

78.     Defendants Capps, Connelly, Serna, and Sean Sherman were deliberately indifferent to the substantial risk which Armendariz' associates and/or security threat group posed to Plaintiff at NSP, (a risk which had been created or increased by placing Armendariz at

14

TSCI and placing him in direct contact with Plaintiff) and allowed those inmates to enter Plaintiff's cell to assault and stab him.

79.    As a direct and proximate result of each of these defendants' deliberate indifference to those risks, Plaintiff: a) suffered continuous fear and other mental and emotional harm from the date when he learned that Armendariz was placed at TSCI; b) suffered emotional and physical harm, and was forced to defend himself alone against his brother's murderer, Armendariz, when Defendants forced Plaintiff into contact with Armendariz; c) was placed in isolation in SMU and subjected to discipline for defending himself from a risk that should have been avoided; and, d) was assaulted, beaten and repeatedly stabbed by Armendariz' associates or members of Armendariz' security threat group, at NSP.

80.    Plaintiff suffered serious mental (including PTSD), emotional, and physical harm and damage as a direct and proximate result of Defendants' deliberate indifference. Plaintiff has suffered, and is suffering mental anguish, emotional distress, present and future disability; past lost wages and future loss of wages; and has incurred attorney and other legal fees.

81.    Plaintiff is without adequate or complete remedy at law to redress the wrongs described above. Plaintiff has been and will continue to be irreparably injured by the conduct of Defendants unless this Court grants the declaratory and injunctive relief Plaintiff seeks.

Claim II – 42 U.S.C. § 1983 – Denial of Health Care

82.    Plaintiff re-pleads the allegations of paragraphs 1 through 81 above and incorporates them herein, as if fully set forth.

83.    Plaintiff had several serious medical needs. The first was assessment and treatment for the extreme fear he suffered as a result of his proximity to Armendariz at TSCI. The second was assessment and treatment for the injuries he suffered as a result of his altercation

with Armendariz at TSCI. The third was assessment and treatment for the injuries Plaintiff suffered as a result of his being assaulted and repeatedly stabbed at NSP.

84.    Defendants Frakes, Hansen, Houseman, Neujahr, Talent, Athena Sherman, Bussboom and John Does 1 through 5 were all aware of the injuries Plaintiff suffered at TSCI, and that he had serious medical needs as a result. These Defendants were aware of Plaintiff's repeated requests for separation, protection, and transfer, which were a clear expression of his fear. They were also aware of his physical altercation with Armendariz and the injury that altercation caused to him. On information and belief, John Does 1 through 5 were directly involved with and/or responsible for treating Plaintiff's injuries at TSCI.

85.    Defendants Frakes, Capps, and John Doe Nos. 1 through 5 were all aware of the injuries Plaintiff suffered at NSP, and that he had serious medical needs as a result. Plaintiff was left with stab and other obvious wounds following the attack at NSP. Capps was the warden at NSP. Frakes was the director of NDCS. On information and belief, John Doe Nos. 1 through 5 were directly involved with and/or responsible for treating Plaintiff's injuries at NSP.

86.    Defendants Frakes, Hansen, Capps, Houseman, Neujahr, Talen, Athena Sherman, Bussboom, and John Does 1 through 5 were deliberately indifferent to the serious health conditions and needs of Plaintiff, ignored his requests for treatment, and failed to provide him with timely and proper care for the injuries that he suffered.

87.    As a direct and proximate result of these Defendants' deliberate indifference to Plaintiff's health conditions and needs, Plaintiff suffered damage.

88.    Plaintiff is without adequate or complete remedy at law to redress the wrongs described above.  Plaintiff has been and will continue to be irreparably injured by the conduct of Defendants unless this Court grants the declaratory and injunctive relief Plaintiff seeks.

Claim III – 42 U.S.C. § 1983 – Isolation

89.    Plaintiff re-pleads the allegations of paragraphs 1 through 88 above and incorporates them herein, as if fully set forth.

90.    Defendants Frakes, Hansen, Capps, and Athena Sherman subjected Plaintiff to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution by transferring Armendariz to a facility where they knew it would pose a substantial risk to Plaintiff, such that Plaintiff would be unable to be housed in general population or protective custody due to safety concerns, whereby forcing him into isolation. These Defendants did this even though they were aware of the long-standing central monitoring determination to separate Armendariz and Plaintiff by institution.

91.    Defendants Frakes, Hansen, and Athena Sherman subjected Plaintiff to cruel and unusual punishment in violation of the Eight and Fourteenth Amendments to the United States Constitution by placing him in isolation at TSCI as a result of the altercation with Armendariz, which those Defendants forced him into.

92.    As a direct and proximate result of Defendants' deliberate indifference to those risks, Plaintiff was subjected to isolation and deprived of certain basic necessities, including movement, exercise, showering, contact with other people, all without a valid reason, and he suffered damage.

93.    Plaintiff is without adequate or complete remedy at law to redress the wrongs described above.  Plaintiff has been and will continue to be irreparably injured by the conduct of Defendants unless this Court grants the declaratory and injunctive relief Plaintiff seeks.

Claim IV – 42 U.S.C. § 1983 – Due Process

94.    Plaintiff re-pleads the allegations of paragraphs 1 through 93 above and incorporates them herein, as if fully set forth.

95.    Defendants Frakes, Hansen, Capps, and Athena Sherman all violated Plaintiff's right to due process under the Fifth and Fourteenth Amendments by facilitating and/or approving the transfer of Armendariz to TSCI, in violation of the long-standing NDCS central monitoring designation to separate Armendariz and Plaintiff by institution, and contrary to established NDCS policy. Armendariz' transfer was facilitated and approved by these Defendants with the known potential for harm to Plaintiff.

96.    Defendants Frakes, Hansen, Athena Sherman, and De La Cruz violated Plaintiff's right to due process by facilitating or allowing Armendariz' placement in the same TSCI housing unit as Plaintiff.

97.    Defendants Frakes, Capps, and John Does 1 through 5 violated Plaintiff's right to due process by allowing associates of Armendariz or members of his security threat group free access to Plaintiff at NSP.

98.    All these actions or omissions imposed atypical and significant hardships on Plaintiff in relation to the ordinary incidents of prison life.

99.    Defendants' actions or omissions were the proximate cause of damage to Plaintiff.

100.   Plaintiff is without adequate or complete remedy at law to redress the wrongs described above. Plaintiff has been and will continue to be irreparably injured by the conduct of Defendants unless this Court grants the declaratory and injunctive relief Plaintiff seeks.

Claim V – 42 U.S.C. § 1983 – Equal Protection

101.    Plaintiff re-pleads the allegations of paragraphs 1 through 100 above and incorporates them herein, as if fully set forth.

102.    Defendants Frakes, Hansen, Capps, Bussboom, Athena Sherman, Talent, Neujahr, Houseman, Haussler, De La Cruz, Sean Sherman and Sabatka-Rine all violated Plaintiff's right to equal protection of the law guaranteed by the Fourteenth Amendment when they disregarded central monitoring records and established policy, and placed Armendariz at the same facility as, and in direct contact with Plaintiff.

103.    Defendants Frakes, Capps, and John Does 1 through 5 violated Plaintiff's right to equal protection when they failed to protect him from the known risk posed by Armendariz' associates or members of his security threat group at NSP.

104.    Defendants routinely afford white inmates the protections of separation from threats and adherence to central monitoring policy. Plaintiff is black, and Defendants denied him those protections.

105.    Defendants' actions or omissions were the proximate cause of damage to Plaintiff.

106.    Plaintiff is without adequate or complete remedy at law to redress the wrongs described above. Plaintiff has been and will continue to be irreparably injured by the conduct of Defendants unless this Court grants the declaratory and injunctive relief Plaintiff seeks.

RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the following relief:

A.    A declaratory judgement stating that:

1)    Defendants' conduct described above violated Plaintiff's Fifth, Eighth, and Fourteenth Amendment rights; and,

2)     Defendants actions described above were the proximate cause of Plaintiff's injuries.

B.     An injunction upon Defendants Frakes, Gable, Lewien, and Boyd, prohibiting them from placing Plaintiff at the same facility as Armendariz or his security threat group while they are in NDCS custody;

C.     An injunction ordering Defendants Frakes and John Does 1 through 5 to immediately arrange for the complete physical and mental medical examination of Plaintiff so that Plaintiff can be fully treated for the injuries caused by Defendants, and to provide to Plaintiff all health care deemed to be medically necessary.

D.     An injunction:

1)     Expunging Plaintiff's institutional record for any misconduct report associated with the above related incidents;

2)     Re-instating any institutional job Plaintiff previously held giving him back pay; and,

3)     Restoring any lost good time for any of the incidents related to this case.

E.     An award of compensatory damages in the following amounts:

1)     $100,000 jointly and severally against: Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Talent, Neujahr, Houseman, Capps, Haussler, Sean Sherman, De La Cruz, and Sabatka-Rine for the injuries which Plaintiff suffered at TSCI following Armendariz' transfer there;

2)     $10,000 jointly and severally against: Frakes, Hansen, Bussboom, Connelly, Serna, Athena Sherman, Talent, and Neujahr for the deprivation of liberty while in SMU;

20

3)      $1,000,000.00 jointly and severally against:  Frakes, Capps, Haussler, Sean Sherman, De La Cruz, Sabatka-Rine and John Does 1 through for the dangerous circumstances and violent assault upon Plaintiff while at NSP.

4)      $50,000.00 for the denial of proper health care; and,

5)      $100,000.00 for the equal protection violations.

F.      An award punitive damages in the separate amount of $50,000.00 per defendant, against each defendant.

G.      Such other and further relief as may be appropriate.

DEMAND FOR JURY TRIAL

To the extent allowed by law, Plaintiff requests that his claims be tried to a jury.

Dated: August 26, 2022.

CAMERON WILLIAMS, Plaintiff,

By: _/s/ Joshua D. Barber_____
Joshua D. Barber        #22624
Barber & Barber, P.C., L.L.O.
P.O. Box 4555
300 North 44th Street, Suite 205
Lincoln, NE  68503
Phone: (402) 434-5429
Fax: (402) 434-5430
joshuabarber@yahoo.com
Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

       I hereby certify that on August 26, 2022, I electronically filed the foregoing with the Clerk of this Court by using the CM/ECF system, which sent electronic notice of the filing to the registered attorneys of record in this matter, including Katherine O'Brien, at katherine.obrien@nebraska.gov.


          */s/ Joshua D. Barber*

          Attorney for Plaintiff