IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CAMERON WILLIAMS,

Plaintiff,

vs.

SCOTT FRAKES, et al.,

Defendants.

4:22CV3071

MEMORANDUM AND ORDER

This matter is before the Court on Defendants', Scott Frakes (Director of the Nebraska Department of Correctional Services ("NDCS"))[1], in his official and individual capacities, Brad Hansen, (Warden at the Tecumseh State Correctional Institution, ("TSCI")), in his individual capacity, Christopher Connelly (NDCS intelligence captain/administrator), in his individual capacity, Scott Busboom (Deputy Warden at TSCI), in his individual capacity, Matilda Serna (NDCS central intelligence unit captain), in her individual capacity, Athena Sherman (NDCS restrictive housing unit manager and unit administrator at TSCI), in her individual capacity, Susan Tallant (housing unit manager at TSCI), in her individual capacity, Nicholas Neujahr (case manager and housing unit manager at TSCI), in his individual capacity, Justin Houseman (case manager at TSCI), in his individual capacity, Michele Capps (Deputy Warden at Nebraska State Penitentiary in Lincoln ("NSP")), in her individual capacity, Todd Haussler (NDCS restrictive housing unit manager at TSCI), in his individual capacity, Chelsea De La Cruz (unit case manager at TSCI), in her individual capacity, and Diane Sabatka-Rine (Deputy

---

[1] The positions listed are the positions the Defendants held at the time the lawsuit arose. Many defendants have new jobs/titles or are no longer employed by NDCS.

1

Director of Operations at NDCS), in her individual capacity,  (collectively, "Defendants")
Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.  Filing No. 262.

Plaintiff Cameron Williams brought this action for alleged violations of his
Constitutional rights to be free from cruel and unusual punishment and alleged violations
of his due process and equal protection rights under 42 U.S.C. § 1983.  Filing No. 82,
Amended Complaint.  Plaintiff has included five Section 1983 claims against Defendants:
failure to protect, denial of health care, improper isolation, violation of his right to due
process, and an equal protection claim.

For the reasons stated herein, the Court grants Defendants' motion for summary
judgment, in part, and denies Defendants' motion for summary judgment, in part.

## I.    BACKGROUND

Plaintiff is currently on parole, but the events leading to this dispute occurred while
Plaintiff was incarcerated in NDCS.  NDCS has a process referred to as "central
monitoring" in which they collect, maintain, and share information regarding conflicts
between inmates and/or staff wherein inmates may be kept separate from inmates/staff
to maintain safety and security.  Filing No. 272-9 at 125.  Central monitoring is not a
classification status and doesn't automatically require separation of inmates by
facility/location, but it is a determination made by the warden.  *Id.*[2]

In 2011, while Plaintiff was incarcerated, Jonathan Armendariz ("Armendariz")
murdered Plaintiff's brother and was sentenced to life for that homicide.  Filing No. 264-9
at 6.  Plaintiff, then a juvenile, requested central monitoring and that request was

---

[2] The policy submitted as evidence in this case is dated 11/30/17.  The policy has been revised several
times between 2011 (when the Williams/Armendariz central monitoring was established) and 2017, but it is
unknown what those changes were.  *See* Filing No. 272-9 at 122.

investigated by NDCS and approved on October 24, 2011, and remained in effect until 2022. Filing No. 272-1 at 26–27; 56. The designation indicates "separate by institution." *Id*. at 27. There is a disputed fact as to what this designation means. Defendant Hansen (former warden at TSCI) indicates that there are designations either by unit or institution. Filing No. 272-6 at 10–11. Defendant Nicholas Neujarh, unit manager, concurred and stated that "separate by institution" means they should be kept at different facilities. Filing No. 272-1 at 27. Defendant Athena Sherman, unit manager/ unit administrator indicated that "separate by institution" was more of a "recommendation." Filing No. 272-3 at 24–25. Although she admits, it doesn't specifically say that in the policy. *Id*. at 27–28. Defendant Diane Sabatka-Rine, Deputy Director of Operations, indicated that even if there was central monitoring that said, "separate by institution," inmates could be "separate" in the same institution if one was in restrictive housing and the other one in general population. Filing No. 272-9 at 35. The facts also show that in 2022 the central monitoring designation "separate by institution" was changed to "separate by unit" for Armendariz and Plaintiff. Filing No. 272-1 at 41. Neither party has provided any evidence as to why that change was made.

Plaintiff was an inmate at the Tecumseh State Correctional Institute ("TSCI") from July 2013 to May 30, 2018. Filing No. 272-11 at 2. Plaintiff was in housing Unit 2 from December 14, 2016, until May 25, 2018. *Id*.

Notwithstanding the central monitoring designation, Armendariz was transferred from NSP to TSCI on April 6, 2017. Filing No. 272-9 at 79. The transfer document indicates that on that same date he was placed on immediate segregation ("IS") due to his active membership in a security threat group ("STG") (i.e. Surenos gang). *Id*. Deputy

3

Warden Michele Capps made the request for transfer.  *Id*. at 27; 79.   According to the transfer order for Armendariz, there is no indication that central monitoring was reviewed prior to his transfer to TSCI on April 6, 2017.  *Id*. at 28–29; 110.  Defendant Sabatka-Rine indicated that the transfer of Armendariz did not receive "central transfer authority" which is contrary to policy.  *Id*. at 27–28; 30.  And she does not know why Armendariz was transferred to TCSI because NSP also had restrictive housing.  *Id*. at 31.  Warden Brad Hansen does not know why Armendariz was transferred to his facility.  Filing No. 272-6 at 27.

When he was transferred to TCSI, Armendariz was placed in the Special Management Unit ("SMU" and also referred to at times as restrictive housing unit) which was a building separate from general population from April 6, 2017, to May 29, 2018.  Filing No. 272-7 at 28; 56.  Armendariz went through various reviews of his long-term restrictive housing classification ("LTRH").  Filing No. 272-9 at 81–109.  In November 2017, Sabatka-Rine participated in a multidisciplinary review of Armendariz's long-term restrictive housing classification.  The disposition was as follows:

> Continue longer term restrictive housing, high risk based on active membership in STG, accompanied by specific and reliable confidential information that he is engaged in/directed dangerous or threatening behavior of others to include directing STG, contraband trafficking, and assaults.   Behavior presents continued risk to staff/inmate safety. Continued intensive supervision and intervention as identified on the behavior;/ programming plan is warranted. Continued program participation is recommended to prepare for transition to less restrictive housing.

Filing No. 272-9 at 17–18.  Armendariz went through additional reviews in March 2018, April 2018, and May 2018 and his classification in long-term restrictive housing remained the same.  *Id*. at 20–21.  According to the Defendants' documentation, Armendariz's classification as long-term restrictive housing never changed before May 25, 2018, and if

4

it had, Defendant Sabatka-Rine should have approved it. *Id*. at 40. Sabatka-Rine further admitted that "[i]t would be contrary to department policy to remove him from long-term restrictive housing without the proper authority making that decision." *Id*. at 41. Witness Shawn Sherman, intelligence team leader, confirmed that central office would need to approve removal from long-term restrictive housing and no such documents exist in evidence that indicate such approval was given in May 2018. Filing No. 272-5 at 59–60.

Sometime in 2017, Plaintiff learned that Armendariz was at TSCI and making threats against him. Filing No. 272-11 at 2. On October 1, 2017, Plaintiff wrote a letter to Defendant Frakes requesting transfer from TSCI to NSP "due to central monitoring issues" and being housed in the same facility as "the individual who killed my brother." Filing No. 264-8. That letter was received by Frakes and responded to by Defendant Sabatka-Rine who informed Plaintiff that he would continue to be housed in the same institution as Armendariz. Filing No. 272-9 at 74. Specifically, she stated "[w]hen the time comes for the removal [of Armendariz] from SMU a review of appropriate housing will be conducted to ensure your safety as well as everyone else's." *Id*. That letter was approved by Warden Hansen. *Id*. at 68.

On or about March 13, 2018, Plaintiff requested a transfer from his unit manager from TCSI to NSP. Filing No. 272-1 at 54. Plaintiff asked Defendant Neujarh to be transferred because "he believed there was someone in the Restrictive Housing, Special Management Unit that he would have issues with if they were to come out to General Population." *Id*. at 22. That transfer was approved March 23, 2019, through the chain of command. *Id*. at 21, 54. Although Plaintiff had been approved for transfer to NSP, as of May 25, 2018, that transfer did not take place. Plaintiff continued to ask Defendant

5

Neujarh about his transfer to NSP at least two to three times a month expressing concern about a central monitoring issue. *Id.* at 43–45.

Plaintiff's mother also advocated for the separation of the two inmates, and NDCS assured her that the two inmates would live separately and would update her on any housing changes of the two inmates. Filing No. 272-12 at 1–2.

Defendant Sabatka-Rine admitted that on May 25, 2018, "There should have been no reason for [Armendariz] to be escorted out of restrictive housing to any general population unit." Filing No. 272-9 at 41. Sabatka-Rine also admitted that based on her October 25, 2017, letter to Plaintiff, TSCI should have initiated a review of central monitoring to ensure separation, and that was not done. *Id.* at 39. Defendant De La Cruz also testified that inmates with central monitoring concerns shouldn't be in the same gallery due to safety concerns. Filing No. 272-7 at 25.

However, May 25, 2018, a case worker was escorting Armendariz "from Intake to Housing Unit 2D19." Filing No. 272-7 at 58. Neither party has provided any specific clarification as to why Armendariz was going to housing unit 2D19 on May 25, 2018. Plaintiff testified that when he saw Armendariz in housing unit D on May 25, 2018, he was "with his property." Filing No. 264-9 at 17. Defendant De La Cruz testified that based on the misconduct report, it appears that Armendariz was being moved to cell number 19 in Housing Unit 2D. Filing No. 272-7 at 32–33. De la Cruz explained that when an inmate comes "out of restrictive housing SMU they have to go through intake. From there they get their property. They get khakis, and then an escort is called. And the escort takes the individual with their picture care to their assigned living location." *Id.* at 41.

When Plaintiff saw Armendariz in housing unit 2 on May 25, 2028, he felt he had to protect himself by starting an altercation that would separate them. Filing No. 264-9 at 18. Plaintiff punched Armendariz in the back of the head. *Id*. Plaintiff knew that by throwing the first punch he would be put into segregation. *Id*. at 19.

After that encounter on May 25, 2018, Plaintiff was placed in the Special Management Unit at TCSI for five days and then he was transferred to NSP. Filing No. 272-11 at 4.

Despite all of the restrictive housing recommendations, four days later, on May 29, 2018, the documents show Armendariz was removed from segregation and transferred to general population in housing unit 2D. Filing No. 272-7 at 28, 56. Warden Hansen stated that in relation to a removal from the special management unit, he would expect "to see a long-term restrictive housing document" approving the removal. Filing No. 272-6 at 28. Neither party has presented any documentation that the long-term restrictive housing classification for Armendariz was ever changed while at TSCI.

On September 22, 2018, inmates associated with Armendariz attacked Plaintiff while at NSP, causing significant facial trauma, including a fracture of the maxillary bone, which required surgery; severe bruising and two stab wounds in his torso. Filing No. 264-7 at 12–13. Plaintiff spent two days in Bryan Hospital in Lincoln, Nebraska. *Id*. He was released on September 24, 2018, to a skilled nursing facility in Lincoln that is separate from NSP for an undisclosed period of time. *Id*. at 35. The investigation after this assault indicated that Plaintiff was assaulted by several other inmates as retribution for Plaintiff's previous assault on Armendariz in TSCI in May 2018. Filing No. 272-8 at 25–26. This

dispute was bringing about racial tensions between Black and Hispanic groups in the prison. *Id.* at 27.

On September 26, 2018, Defendant Matilda Serna removed Plaintiff from the medical facility where he was recovering from his injuries. Filing No. 272-11 at 5. Serna removed him from the medical unit to and transported out of the hospital in order to "talk to him" about his assault on September 22, 2018. Filing No. 272-8 at 51. Also, she transported him back to NSP to participate in a meeting with other inmates to try to avoid a "war between races" which was brewing as a result of the assault on Plaintiff. *Id.* at 59–60; Filing No. 272-11 at 5–6.

Defendants have filed a motion for summary judgment alleging they are entitled to qualified immunity.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) and (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251. However, a party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256–57).

Qualified immunity "shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *See Joseph v. Wheeler*, 144 F.4th 1111, 1113 (8th Cir. 2025). "To determine whether the defendants are entitled to qualified immunity, the Court must determine whether they violated a constitutional right and whether that right was clearly established. *See Melton v. City of Forrest City, Arkansas*, 147 F.4th 896, 901–02 (8th Cir. 2025). If the answer to either question is no, the defendants are entitled to qualified immunity." *Hamilton v. Earl*, 166 F.4th 1143, 1146 (8th Cir. 2026) (citing *McDaniel v. Neal*, 44 F.4th 1085, 1089 (8th Cir. 2022)).

## III.  DISCUSSION

### A.  Eighth and Fourteenth Amendment Claims

The Eighth Amendment's prohibition on cruel and unusual punishment, as applied to States through the Fourteenth Amendment, limits the conditions in which a State may confine convicted criminals. *Robinson v. California*, 370 U.S. 660 (1962); *Rhodes v. Chapman*, 452 U.S. 337 (1981). The Eighth Amendment's prohibition against "cruel and unusual punishments" requires that prison officials provide humane conditions of confinement. "Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

### 1.  Violation of Due Process

Plaintiff alleges that his right to due process was violated when Defendants facilitated or approved the transfer of Armendariz to TSCI in violation of their central

10

monitoring policy and further violated his rights when they transferred him to the same housing unit.

"In order to prevail on a Fourteenth Amendment due process claim, [plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action." *Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003). In this case, there is no question that Plaintiff was not denied life or property, so he must show that he was deprived of a liberty interest to prevail on this claim.

The Eighth Circuit Court of Appeals has stated that there is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations. *Phillips*, 320 F.3d at 847, (citing *Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996)). "Rather, any liberty interest must be an interest in the nature of the prisoner's confinement, 'not an interest in the procedures by which the state believes it can best determine how he should be confined.'" *Id.;* (quoting *Kennedy*, 100 F.3d at 643).

Consequently, as to the claim that officials failed to comply with policy or regulations, that claim is denied. However, the Court finds that with conditions of confinement, as discussed below, Plaintiff has shown that questions of fact exist sufficient to overcome summary judgment.

### 2. Failure to Protect

Plaintiff alleges that Defendants violated his Eighth Amended constitutional rights by failing to protect him while he was incarcerated. Defendants claim they are entitled to qualified immunity on this claim.

It is now well-settled that "prison inmates have a clearly established Eighth Amendment right to be protected from violence by other inmates." *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000) (citing *Farmer*, 511 U.S. at 833). The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832, (quoting *Hudson*, 468 U.S. at 526–27). Specifically, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833, (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Furthermore, a "prison official violates this right when "he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." *Newman v. Holmes*, 122 F.3d 650, 652 (8th Cir. 1997).

A failure-to-protect claim has an objective component, whether there was a substantial risk of harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk. *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 834). For the first prong, Plaintiff must "demonstrate that defendants knew of the substantial risk of serious harm to the victim." *Letterman v. Does*, 789 F.3d 856, 861 (8th Cir. 2015). Although Plaintiff need not show that Defendants had actual knowledge of the risk, he must at least show they "had been exposed to information concerning the risk and 'thus must have known' about it." *Id.* (quoting *Farmer*, 511 U.S. at 842). Each defendant's knowledge is considered without "hindsight's perfect vision." *Jackson*, 140 F.3d at 1152. Plaintiff must demonstrate each defendant was "aware of facts from which the inference could be drawn that a substantial

12

risk of serious harm [existed]" and that each defendant drew that inference. *Farmer*, 511 U.S. at 837.

The Court acknowledges that this knowledge prong can be difficult to meet. The Eighth Circuit has held that even direct threats between inmates "are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996). "Vague and unsubstantiated" claims of concern made by inmates to guards also fall short of the standard. *Davis v. Scott*, 94 F.3d 444, 447 (8th Cir. 1996). Awareness of an inmate's violent past likewise does not alone put prison officials on notice that the inmate will harm other random inmates in the future. *See Curry*, 226 F.3d at 978. There must be "longstanding, pervasive, well-documented, or expressly noted information concerning the risk" to show the defendants had adequate knowledge. *Farmer*, 511 U.S. at 842.

In addition to showing that Defendants knew of the risk, Plaintiff must satisfy the second prong by offering evidence that Defendants deliberately disregarded the risk. *See Blair v. Bowersox*, 929 F.3d 981, 987–88 (8th Cir. 2019). Plaintiff must show the prison officials "'knew that their conduct was inappropriate in light of' the risk." *Letterman*, 789 F.3d at 862 (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)). Significantly, the standard goes beyond negligence and "requires a highly culpable state of mind approaching actual intent," which is akin to criminal recklessness. *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017); *see also Letterman*, 789 F.3d at 862 (stating that deliberate indifference requires showing more than negligence). "As § 1983 liability for damages for a federal constitutional tort is personal, each defendant's conduct must be independently assessed." *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015). Similarly, "[t]o state a

claim against a supervisor, a plaintiff must show that the supervising official, through his own individual actions, violated the Constitution." *Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant [including supervisors], through the official's own individual actions, has violated the Constitution." (citing *Ashcroft*, 556 U.S. at 676)). Therefore, to overcome qualified-immunity, Plaintiff must show each Defendant violated his constitutional right and such right was clearly established when it was violated. *See Vandevender v. Sass*, 970 F.3d 972, 975 (8th Cir. 2020); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Plaintiff argues his claim overcomes Defendants' assertions of qualified immunity and the Court agrees, in part. Plaintiff maintains that each Defendant violated his constitutional rights by failing to protect him from Armendariz.

Generally, the Court notes that this is not the case where Plaintiff has alleged vague or unsubstantiated threats. Plaintiff was clear that he feared one particular inmate, Armendariz (his brother's killer). Many of the Defendants knew about the relationship between these two inmates, and that issue had been well-documented since 2011. NDCS conducted an investigation and issued a central monitoring designation between Armendariz and Plaintiff in 2011 which remained in effect through 2022. That directive was that the inmates were to be "separated by institution."

Moreover, Armendariz's long-standing violent and threatening behavior was also well-documented. He was a known gang member and part of the security threat group known as the "Surenos." The documentation shows that he had several violent

14

interactions and was in segregated housing for long periods of time. In fact, he was transferred to TSCI for "immediate segregation" due to security issues at NSP. There was "solid evidence" of a clear and identifiable risk to Plaintiff's safety. *See Davis,* 94 F.3d at 447.

With regard to the second prong, the Court finds that there are material questions of fact as to whether Defendants deliberately disregarded the known risk. Plaintiff has shown that Armendariz was moved to Tecumseh in April 2017 for some unknown and undisclosed reason. Moreover, the undisputed testimony indicates that when that transfer took place, no one checked central monitoring. Defendants have offered no explanations with regard to those actions, and therefore the Court must assume Plaintiff's allegations are true that these oversights were intentional and a reasonable jury could believe that such behavior rises to the level of criminal recklessness.

After many months of complaining of being in the same facility as his brother's killer, Plaintiff's request to transfer from TSCI to NSP was finally approved in March 2018. But the transfer didn't take place. Again, there is a question of fact that was never answered by Defendants, as to why Plaintiff was never actually transferred until after the altercation with Armendariz on May 25, 2018.

In addition, after realizing that Armendariz was in the same institution as Plaintiff, Defendants back track and claim that "separate by institution" doesn't really mean separate institutions. The Court finds that there is a material question of fact as to what this designation means. A fact is material if it "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248.

But even if the Court was persuaded by the Defendants' version that "separate by institution" can mean keep one inmate in segregation and the other in general population, Defendants didn't do that. Despite assurances to Plaintiff, and his mother, that he and Armendariz would not be housed together or be in the same unit because "segregation is like a separate city," Armendariz was being escorted into general population on May 25, 2018. *See* Filing No. 272-8 at 30. Ironically, it was at a time that Plaintiff was sitting alone on a bench in the lobby area. A reasonable jury could infer that Defendants knew their conduct was intentional and inappropriate and well-beyond mere negligence.

Although it is true that Plaintiff initiated the altercation with Armendariz on May 25, 2018, the unprovoked attack on Plaintiff on September 22, 2018, was undeniably connected and "retribution" by Defendants' own admissions. Plaintiff's claims arise out of Defendants' alleged failure to keep Armendariz away from him and the other consequences that flowed from that failure. It was foreseeable that if put in the same housing unit someone would be hurt; regardless of who instigated the fight. Again, a reasonable jury could find that Defendants acted with deliberate indifference when they released Armendariz from special management unit (segregation) into general population.

Specifically, the Court finds that the following individual Defendants were aware of the objective risk Armendariz posed to Williams based on the following facts.

**Scott Frakes:** Plaintiff has shown that Frakes was aware of the objective risk to him by Armendariz through the letter Plaintiff penned to Frakes on October 1, 2017, detailing his fears of Armendariz and the fact that there was a central monitoring designation in place. The fact that Frakes delegated writing a response to Ms. Sabatka-

16

Rine does not diminish his objective knowledge. The Court finds that a reasonable jury could find that Frakes was deliberately indifferent to that risk of harm when he disregarded the central monitoring designation and failed to transfer Plaintiff in 2017.

However, Plaintiff has also sued Frakes in his official capacity, and that claim will be dismissed. The law is settled that state "officials acting in their official capacities are [not] 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

**Michele Capps:** Plaintiff has shown that Capps (deputy warden at NSP) was aware of the objective risk to him by Armendariz when she requested/approved the transfer of Armendariz to TCSI. By not following protocol and checking central monitoring before sending a dangerous inmate into "immediate segregation," the Court must impute intent on her part. Defendants have presented no reason why Armendariz was transferred to TCSI and no reason why Deputy Warden Capps didn't check central monitoring first. A reasonable jury could find that this complete lack of attention to protocols was intentional and inappropriate so that it rises to a level well beyond negligence.

**Diane Sabatka-Rine:** Plaintiff has shown that Sabatka-Rine was aware of the objective risks to Plaintiff by her response to Plaintiff's letter to Frakes. She disregarded those risks as the letter she wrote on October 25, 2017, indicates. Moreover, she was part of the committee that reviewed Armendariz's long-term restrictive housing and admitted that there was no reason that Armendariz should have been in housing unit 2B on May 25, 2018. Notwithstanding her initial denial of Plaintiff's transfer, someone approved it on March 23, 2018. However, no one has been able to provide any evidence

17

to establish why the transfer did not take place for more than two months.  A reasonable jury could find that Sabata-Rine was deliberately indifferent to Plaintiff's safety as the person in charge of maintaining Armendariz's long-term housing restrictions.

**Susan Tallant:**  Plaintiff has shown that Defendant Tallant was objectively aware of the risk to Plaintiff by Armendariz.  She admitted that Plaintiff advised her of the central monitoring issue and that he wanted an immediate transfer.  Filing No. 272-4 at 16.  She further admitted she verified the central monitoring issue between Plaintiff and Armendariz and discussed the matter with Deputy Warden Busboom and then they denied his request for transfer.  *Id*. at 17.  But she stated, "I don't know why anyone would put [Armendariz] in 2B if there was central monitoring, in my personal opinion."  *Id*. at 18–19.  A reasonable jury could find that her conduct was inappropriate and more than mere negligence.

**Justin Houseman:**  Plaintiff has shown that Houseman had objective knowledge of the risk Armendariz posed to Plaintiff.  Houseman was Plaintiff's case manager, and the evidence indicates that when Plaintiff came up for reclassification, Houseman made the recommendation to transfer him to NSP.  Filing No. 272-4 at 22–23.  Houseman was aware that Plaintiff wanted to transfer because of a central monitoring issue.  *Id*. at 25.  A reasonable jury could find that Defendant Houseman's conduct was inappropriate in not expediting the transfer request light of his knowledge of the approval transfer and the risk Armendariz posed to Plaintiff.

**Nicholas Neujarh:**  Plaintiff has shown that Neujarh had objective knowledge of the risk Armendariz posed to Plaintiff.  Plaintiff spoke to Neujarh about transferring because there was someone in restrictive housing/special management that he would

18

have issues with. Filing No. 272-1 at 22. Defendant Neujarh was the "requesting authority" on the transfer order. *Id*. at 18; 54. That review included looking at central monitoring. *Id*. at 20. The transfer was approved March 23, 2018. *Id*. at 21. Plaintiff continued to ask Neujarh when he would be moved expressing his concern about someone in central monitoring. *Id*. at 43–45. A reasonable jury could find that Defendant Neujarh's conduct was inappropriate in not expediting the transfer request light of his knowledge of the approval transfer and the risk Armendariz posed to Plaintiff.

**Athena Sherman:** Plaintiff has successfully shown that Defendant Sherman had objective knowledge of the risk Armendariz posed to Plaintiff. As unit manager of the Restrictive Housing Unit at TSCI from October 2016 to September 2017 (when Armendariz was in segregation), Sherman was responsible for classification of inmates. Filing No. 272-3 at 12–13. As unit manager, she was in charge of intake at the time Armendariz was transferred to TSCI on April 6, 2017, although she did not personally do the paperwork. *Id*. at 16–17; 20–21. In addition, as unit administrator she oversaw the classification of the entire facility. *Id*. at 14. She was also responsible for transfers, including removal from long-term restrictive housing. *Id*. at 31–32. She claims she does not know why Armendariz was transferred to TSCI. *Id*. at 27.

**Scott Busboom:** Plaintiff has shown that deputy warden Busboom had objective knowledge of the risk of Armendariz to Plaintiff. Busboom was on the executive team in charge of classification of inmates at TCSI during the relevant periods of time. Filing No. 272-3 at 14–15. Plaintiff's evidence also shows that on or about April 12, 2017 (less than a week after he was transferred), Busboom promoted Armendariz from maximum security (1x) to medium security (2x). Filing No. 272-5 at 13; Filing No. 272-9 at 90. In addition,

19

on or about May 2, 2018, Busboom promoted Armendariz from maximum security (1x) to medium security (2x).[3] Filing No. 272-9 at 45–46; 113. That form did not change his restrictive housing classification, and it included central monitoring designation. Id. at 46; 117–18. Furthermore, he was made aware of Plaintiff's request to transfer because he actually signed the transfer. Filing No. 272-1 at 24; 55. A reasonable jury could find that any or all of Busboom's conduct in: 1) allowing the transfer of Armendariz to TCSI without checking central monitoring; 2) reclassifying Armendariz to medium security; 3) failing to immediately approve Plaintiff's transfer when Defendant Tallant discussed it with him; 4) failing to transfer Plaintiff after it had been approved; and/or 5) allowing Armendariz to be transferred to housing unit 2 while Plaintiff was still assigned there was inappropriate and was akin to criminal recklessness.

**Brad Hansen:** Similarly, Plaintiff has shown that Defendant Hansen who was warden at TCSI at the relevant times, had objective knowledge of the risk Armendariz posed to Plaintiff. Hansen did his best to push off all responsibility to his subordinates ("central office was responsible for transferring inmates." Filing No. 272-6 at 20; and "Central Monitoring concerns were run by the unit staff and Mr. Bussboom," and it was "Bussboom's ultimate responsibility because he took care of the housing units and approved or didn't approve Central Monitoring requests." Id.). Notwithstanding that testimony, Sabatka-Rine indicated that the warden determines central monitoring/separation by gallery, unit, or institution. Filing No. 272-9 at 51–52.

In addition, a draft letter from Sabatka-Rine to Plaintiff dated October 10, 2017, indicates that she talked to Hansen who advised her Armendariz was in the Special

---

[3] It is unclear why this "promotion" took place two different times.

20

Management Unit.  Filing No. 272-9 at 69.  Moreover, Hansen reviewed that letter and approved it, including advising Plaintiff to contact Hansen directly with any concerns.  *Id.* at 68.  Plaintiff's mother also contacted Warden Hansen and advised him of the central monitoring situation and asked him to keep Armendariz and her son separate.  Filing No. 272-12 at 2.  A reasonable jury could find that Hansen's conduct was inappropriate insofar as he allowed Armendariz to be transferred to TSCI and then to general population while Plaintiff was still there.

Based on careful review of the facts, the Court finds that a jury could reasonably conclude that Frakes, Hansen, Busboom, Sabatka-Rine, Capps, Tallant, Sherman, Houseman, and Neujarh, violated the Eighth Amendment when they failed to protect Plaintiff

However, the Court finds that there is insufficient evidence to show that Connelly, De La Cruz, Serna, or Haussler had any objective knowledge of any substantial risk of harm specifically directed at Plaintiff or that Plaintiff had made any specific complaints to them regarding Armendariz.  Plaintiff alleges in his Amended Complaint these Defendants knew about Armendariz's transfer to TCSI and knew of the central monitoring designation between Armendariz and Plaintiff or that Plaintiff requested a transfer through them.  But Plaintiff has presented no evidence in support of these allegations.  Plaintiff must present more than unsubstantiated allegations in order to survive summary judgment.  Therefore, Defendants Connelly, De La Cruz, Serna, and Haussler are entitled to qualified immunity on the failure to protect claim.

### B.  Failure to Provide Medical Treatment

Plaintiff next alleges that Defendants failed to provide him mental health treatment from November 2017 to September 28, 2018.  Second, Plaintiff alleges that Defendant Serna removed Plaintiff from a NDCS medical facility where he was recovering from facial surgery and stab wounds to try to resolve a racial incident at the penitentiary.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments."  U.S. Const. amend. VIII.  "A state violates this prohibition when it is deliberately indifferent to a prisoner's serious medical needs." *De Rossitte v. Correct Care Sols., LLC.*, 22 F.4th 796, 802 (8th Cir. 2022).  Plaintiff does not allege that any of the Defendants had any medical training.  The Eighth Circuit Court of Appeals has explained the standard for claims of denial of medical care by defendants without medical training, as follows:

> Prison personnel, like corrections officers, without medical training demonstrate deliberate indifference by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Proof of deliberate indifference requires that an inmate show the following: "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it.

*Rusness v. Becker Cnty., Minnesota*, 31 F.4th 606, 614 (8th Cir. 2022) (internal quotations and citations omitted).

The record lacks sufficient evidence to support the finding that Plaintiff suffered from a serious medical (mental health) need, much less that prison officials knew of that need and deliberately disregarded it during the periods Plaintiff alleges.  First, Plaintiff did not have a documented medical diagnosis directing that he should be receiving mental health therapy from November 2017 to May 2018.  Plaintiff alleges he was diagnosed with post-traumatic stress disorder **after** the stabbing incident on September 22, 2018,

22

and the records indicate that he did receive mental health treatment for that diagnosis. There is evidence in the record that Plaintiff met with medical providers from 2015 through 2019 and didn't make any requests for mental health treatment. Filing No. 264-9 at 10–11. In 2017, Plaintiff met with mental health providers for a "mental health status" check and he reported "no current concerns." *Id*. at 11.

It is therefore difficult to fault Defendants for not providing treatment he was never prescribed. Moreover, there is no evidence in the record that Plaintiff made any request for mental health services from November 2017 to May 2018.

Therefore, Defendants' request for summary judgement regarding Plaintiff's claim that Defendants failed to provide mental health treatment from November 2017 to May 2018 is granted. That claim is dismissed.

Plaintiff was assaulted on September 22, 2018, by other inmates while at NSP. He claims this was in retribution for his attack on Armendariz, which is substantiated by prison staff. Plaintiff was stabbed twice, had a fractured bone in his face and severe bruising. It is undisputed that Plaintiff received immediate medical attention for those injuries. However, Plaintiff's second complaint for failure to provide medical treatment relates to Defendant Matilda Serna removing Plaintiff from the "hospital" which was a NDCS medical facility separate from the penitentiary on September 26, 2018, for a meeting with gang members to try to stave off some kind of gang war in the penitentiary.

The transfer/transportation order that Serna completed was approved by Robert Madsen (not a Defendant) and Deputy Warden Michele Capps on September 26, 2018. Filing No. 272-9 at 56. The evidence indicates that verbal authority was provided for the transfer. *Id*.

23

Defendants do no dispute that after the assault, Plaintiff had an objectively serious medical condition requiring treatment. Furthermore, there is no dispute that Defendant Serna knew of Plaintiff's injuries and knew he was "in the hospital" for said treatment. The question is in light of Serna's knowledge of Plaintiff's serious injuries whether she was deliberately indifferent when she removed him from LCC where he was recuperating and forced him to "negotiate" with gang members. There is no evidence that Serna requested or received approval from any medical provider to remove Plaintiff from the medical unit.

The Court finds there is a question of fact as to whether the removal of Plaintiff during his period of recuperation was "an intentional interference with his prescribed treatment." Defendants presented no evidence, medical or otherwise, that contradicts Plaintiff's assertion. They submitted no reply brief to their Motion for Summary Judgment. Therefore, this claim will survive summary judgment with regard to Defendants Serna and Capps.

### C. Placement in Isolation

Plaintiff next alleges his Eighth and Fourteenth Amendment rights were violated by Defendants when he was placed in isolation (also referred to the parties as "segregation") after he assaulted Armendariz on May 25, 2018. Plaintiff was in isolation for five days until he was moved to NSP on May 30, 2018.

In considering whether Defendants violated Plaintiff's constitutional right to be free of cruel and unusual punishment, the Eighth Circuit Court of Appeals recently recognized that while the Eighth and Fourteenth Amendments don't mandate comfortable prisons, they do prohibit inhumane ones; and prison officials must ensure that inmates "receive

24

adequate food, clothing, shelter, and medical care." *Hamilton v. Earl*, 166 F.4th 1143, 1146 (8th Cir. 2026) (quoting *Farmer*, 511 U.S. at 832).  "Since the constitution protects against cruel and unusual punishments, and not cruel and unusual conditions, it protects prisoners only against unnecessary and wanton infliction of pain, which the Supreme Court has said results from, at a minimum, prison officials' deliberate indifference." *Hamilton*, 166 F.4th at 1146 (internal citations and quotations omitted).

Plaintiff has alleged he was deprived of certain "basic necessities" such as exercise, showering, and contact with other people, but he has not indicated that he was denied food, medical care, or other basic needs.  Nor does Plaintiff elaborate on his actual damages from being in isolation.

The undisputed facts indicate Plaintiff was in isolation for five days before being transferred to NSP in Lincoln.  Moreover, Plaintiff admits that his assault on Armendariz was for the purpose of being separated from him and he knew he would be placed in isolation.  Plaintiff knew what isolation was like because he had been there before. Plaintiff presented no evidence that he made any complaints while he was in isolation. The Plaintiff does not dispute that assaulting an inmate was likely to result in being placed in isolation.  The Court finds that Defendants placing Plaintiff in isolation was not deliberately indifferent.  However, a reasonable jury may find that the Plaintiff's stay in isolation was caused by the deliberated indifference of one or more of the defendants as described above and thus may be recoverable as damages.

Therefore, the Court finds that Plaintiff has not shown that the defendants were deliberately indifferent to him while he was in isolation for five days.  There are no material facts in dispute with regard to this claim and Defendants are entitled to judgment as a

matter of law on the claim of improper isolation.  However, placement in isolation may be considered as a measure of damage for the alleged failure to protect claim.

### D. Equal Protection

Plaintiff also alleges that the prison officials violated his equal protection rights. Plaintiff alleges in his Amended Complaint that Defendants treated white inmates more favorably by providing them the "protections of separation from threats and adherence to central monitoring policy." Filing No. 82 at 19.  Plaintiff does not specifically allege he is a member of a protected class.

If a plaintiff does not allege he is a member of a protected class or that a fundamental right was violated, he must show that "similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Phillips*, 320 F.3d at 848, quoting *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998). "He also must show intentional or purposeful discrimination." *Id.* (citing *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994)). The existence of prison regulations relating to central monitoring is not enough to meet this burden.  Plaintiff has not presented any evidence to support disparate treatment, the absence of a rational relationship to any legitimate penal interest, or intentional discrimination.  Thus, his equal protection claim fails.

## IV.    CONCLUSION

**THEREFORE, IT IS ORDERED THAT,**

1. Defendants' Motion for summary judgment, Filing No. 262, is granted as follows:

    a. Fourteenth Amendment Due process claim; and

26

b.  The official capacity claim against Frakes; and

c.  Eighth Amendment claim for failure to provide mental health treatment; and

d.  Qualified immunity as to Defendants Haussler, Serna, De La Cruz and Connelly regarding the failure to protect claim; and

e.  Claim of Improper Isolation except as it may relate to damages; and

f.  Claim of equal protection.

These claims and defendants are dismissed.

2.  Defendants' Motion for summary judgment, Filing No. 262, is denied as follows:

a.  Eighth Amendment claim for failure to protect against Frakes, Busboom, Hansen, Sabatka-Rine, Capps, Houseman, Neujarh, and Tallant; and

b.  Eighth Amendment claim for failure to provide medical treatment against Capps and Serna.

Dated this 26th day of June, 2026.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge